**IN THE COURT OF APPEALS OF IOWA**

No. 20-1636
Filed March 3, 2021

**IN THE INTEREST OF D.A.,**
**Minor Child,**

**I.A., Mother,**
　　　Appellant,

**F.A., Father,**
　　　Appellant.
_____


　　　Appeal from the Iowa District Court for Polk County, Susan Cox, District Associate Judge.


　　　Parents separately appeal the juvenile court's denial of the father's motion to modify the court's dispositional order. **AFFIRMED ON BOTH APPEALS.**


　　　Kelsey Knight of Carr Law Firm, P.L.C., Des Moines, for appellant mother.

　　　Jeremy Feitelson of Feitelson Law, L.L.C., West Des Moines, for appellant father.

　　　Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee.

　　　Karen A. Taylor of Taylor Law Offices, P.C., Des Moines, attorney for minor child.

　　　Lynn Vogan of Youth Law Center, Des Moines, guardian ad litem for minor child.

Considered by Bower, C.J., Schumacher, J., and Potterfield, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2021).

**POTTERFIELD, Senior Judge.**

D.A. is the teenaged child of the mother and father[1]; she was removed from the parents' care in December 2019. In May 2020, the father filed a motion to modify the dispositional order, asking the court to end D.A.'s out-of-home placement and return her to the family home. The juvenile court denied the motion, and the parents separately appeal. They assert there has been a material and substantial change in circumstances and circumstances in Iowa Code section 232.103(4) (2019) exist so modification of the dispositional order is appropriate. They also contend returning D.A. to their care is in her best interests.

---

[1] D.A. and her family are Syrian nationals who came to the United States as refugees in 2016. The parents do not speak English, and the children have sometimes been used as informal interpreters when service providers drop in. Whether due to the language barrier, lack of official paperwork such as birth certificates, or an actual intent to deceive, there are inconsistencies in the record that we cannot resolve.

For instance, it is unclear whether D.A. was born in January 2004 or 2006. At one point, the court specifically corrected the record to change D.A.'s listed birth date from 2006 to 2004. But it seems D.A. continued to report her birth year as 2006, and the clinical psychologist who completed her psychological evaluation in early 2020 noted D.A. "appeared to be her stated age" of fourteen. Plus another child in the family is listed as having a birth date of May 2004.

Additionally, D.A. told the same psychologist that her biological father died when she was young and the father involved in these proceedings is her stepfather. The mother denies this claim. As far as we can tell, D.A.'s statement was generally disregarded; paternity testing was not completed and everyone proceeded under the assumption the father is the biological father.

We do not presume the narrative and information provided by the parents are reliable. The father pled guilty to two counts of immigration fraud in May 2018 based on providing false information as part of his refugee application. His absence from the family home throughout most of these proceedings was due to these convictions and his resulting sentence. Throughout his time in jail, it was reported the father and rest of the family were at an ongoing risk of being deported due to their loss of refugee status. It was also reported the father would likely be killed if he was deported to Syria.

**I. Background Facts and Proceedings.**

In May 2019, D.A. expressed suicidal ideation. At the time, the father was being held in jail by Immigration and Customs Enforcement (ICE) and was expected to be deported. The mother, who was then the sole caretaker for D.A. and her six siblings, took some steps to get D.A. mental-health treatment but allowed D.A. to quit an intensive outpatient program against medical advice and did not require her to follow through with other mental-health therapy or treatment. The Iowa Department of Human Services (DHS) was already involved with the family due to the family's needs regarding inappropriate discipline (including physical abuse), mental-health treatment, appropriate supervision, and school truancy.

In July, D.A. was adjudicated a child in need of assistance (CINA) pursuant to Iowa Code section 232.2(6)(f). The court determined D.A. was a child "in need of medical treatment to cure or alleviate serious mental illness or disorder, or emotional damage as evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others and whose parent, guardian, or custodian is unwilling to provide such treatment." Iowa Code § 232.2(6)(f). She remained in her parents' custody and living in the family home.

In the months following adjudication, D.A. ran away from home and was twice reported as a missing person. Both times, D.A. was away from home multiple days before returning. According to the court appointed special advocate, after the first instance, D.A. threatened to run away again "the next time her mom hits her or raises her fist." D.A. did not consistently engage in therapy and was resistant to attending. The mother was not supportive of mental-health treatment

for D.A. and, at times, denied she needed it. D.A. also had issues with school—both failing to attend and fighting with peers while there.

D.A. was admitted to the behavioral health unit of a local hospital following an altercation with the mother a few days before the dispositional review hearing on December 2. While hospitalized, D.A. reported physical and emotional abuse from her mother. She was given a provisional diagnosis of adjustment disorder and began taking medications for her depressive symptoms and anxiety. The hospital recommended D.A. go to a foster home after her discharge so she could continue to receive mental-health treatment and work on relationship issues with her mother. Following the December 2 hearing, the juvenile court removed D.A. from the parents' care and custody "due to [her] safety and [mental health] needs going unmet." It noted that "extensive efforts" were "made over [m]any months to try and keep [D.A.] safe with her family and her home" but "it just [had not] proven viable." DHS was ordered to determine a placement commensurate with D.A.'s needs after her release from the hospital.

A week later, while D.A. remained in the hospital, the mother called and told D.A. one of her brothers had been stabbed near his heart. In two follow-up calls to D.A., the mother reported similar information.[2] But later, with the help of a social worker, D.A. learned her brother had not been stabbed and was alive and well. A week after that, D.A. reported to a social worker that she expressed interest to her

---

[2] The mother denied she said this to D.A. But a social worker at the hospital wrote a letter to the court that indicated the worker "observed [D.A.] speaking with her mother on the phone" and saw D.A. "have a genuine response to this information, begin to cry and yell, and enter into a panic attack after hanging up the phone."

mother about the foster family she would be placed with after her discharge and her mother responded, "I wish you were dead."

After D.A.'s discharge from the hospital in mid-December, she was placed in a shelter while DHS attempted to locate a foster home for her. Within a short time of her arrival, D.A. ran away twice and was in an altercation with another girl in the shelter. After one of her elopements, D.A. assaulted a police officer who was attempting to return her to the shelter. D.A. also incurred shoplifting charges while she was on the run from the shelter. As a result, D.A. spent a couple of days in a juvenile detention center. She was back in the shelter only two days before being taken back to the detention center after assaulting another resident at the shelter. Beginning January 4, 2020, D.A. spent a little over two months in juvenile detention before going into foster care on March 8.

D.A. underwent a psychological evaluation in March, and the psychologist's report was available shortly before the dispositional review hearing in April. The clinical psychologist who met with D.A. diagnosed her with other specified trauma and stressor related disorder, oppositional defiant disorder, and adjustment disorder with anxiety and depressed mood. He recommended D.A. participate in individual psychotherapy "to help with symptoms related to mood and acting out behavior" and noted she needed professional help with regulating her emotions and gaining skills to manage interpersonal relationships. Additionally, the psychologist advised, "Structural behavior planning should occur in either foster care or placement. She will need to be told and reminded of expectations, rules, and potential consequences."

A dispositional review hearing took place on April 22. While the mother expressed that she wanted D.A. to be returned home, the court noted the mother's inconsistent testimony about D.A. needing and receiving mental-health therapy. The mother also testified she did not want D.A. to take medication. The social worker testified that DHS had been recommending therapy since April 2019 and had tried to help the mother and D.A. attend by providing protective daycare for the other children so the mother would be free, teaching the mother how to use the public bus system, and setting up individual transportation for the appointments when the mother refused to use the bus. Still, the mother and D.A. only went to one or two appointments, reporting they were busy or forgot when missing the rest.[3] Considering these things and focusing on the psychologist's recommendations for D.A., the court confirmed D.A.'s out-of-home placement, stating:

> Placement outside the parental home is necessary because continued placement in or a return to the home would be contrary to the child's welfare due to unresolved mental health and stability concerns that continue to exist. With the COVID-19 pandemic, the Department (and [juvenile court services]) would not be able to provide intensive supervision and supportive services if [D.A.] were returned home today. [D.A.] has been making progress in the foster home but has only been there about six weeks and needs to show consistent improvement and stability. Both [D.A.] and her family have had six months of chaos,[4] leading to hospitalizations, shelter stays, detention stays, and now placement in an enhanced foster home. Instantly returning [D.A.] to the family home without any sort of transition planning or supportive services in place would not be in her best interest.

---

[3] We do not have a transcript of this hearing. These facts are taken from the juvenile court's written ruling filed on April 22, 2020, which included findings of fact detailing the testimony the court heard.

[4] The family moved homes a number of times, including switching school districts two or three times.

On May 29, the father filed a motion to modify D.A.'s out-of-home placement. He asserted he had been recently released from ICE's custody after spending two years incarcerated by the federal government and would be living in the family home as "deportation back to Syria [was] not allowed at [the] time." The father maintained the return of the family to a two-parent home would "allow for additional supervision of the minor child and make participation in required services easier for the family to comply with."

At a September hearing, the court considered the father's motion contemporaneously with a dispositional review hearing.[5] The father testified he would ensure D.A. went to school and her visits with doctors if she was returned to the parents' custody. He also testified he had videos showing D.A. smoking cigarettes, drinking alcohol, and illegally driving a vehicle so he questioned whether she was being properly cared for and supervised in her current foster home. On cross-examination, the father agreed D.A. has mental-health struggles but denied D.A. has anxiety, depression, or lack of confidence and said he thinks the therapist is wrong in making those diagnoses. He also said he would attend therapy with D.A. but stated he wanted to do it "to show DHS that [D.A.] is just a normal individual" and "there's nothing wrong with her." The father admitted that since shortly after he returned to the family home, he refused to work with or allow into the home the family's long-term case worker, the service provider, and the Refugee Immigrant Guide. He testified he would work with the organizations but

---

[5] Between May 29 and the September 15 hearing, D.A.'s case was assigned to a different judge and the father's attorney withdrew, which required a new attorney be appointed for him.

refused to work with those three individuals because he "consider[s] these three like a Mafia." The father was also asked about an August incident at the family home when a neighbor called the police and reported the father had hit the mother and one of the children, giving the child a bloody nose. DHS issued a founded child-abuse report after investigating the incident. The father denied hitting the mother or the child.

D.A. also testified at the September hearing. She reported therapy was going well and she had been able to show some change in her behaviors since being placed in her current foster home in June. D.A. expressed an interest in being adopted by her foster family, stating she "felt loved. And I started doing school. And I stopped fighting, and I . . . stopped doing the negative stuff, and I just changed myself." When asked if she had concerns about returning to her family home, D.A. replied, "Nothing's going to change. . . . Like, I'm pretty sure if I go back home, . . . . I'm going to be back to the old me, and I don't want that." D.A. testified, "[W]hat's best for me is adoption."

The juvenile court denied the father's motion and confirmed D.A.'s out-of-home placement "due to the parents' inability/unwillingness to meet [D.A.'s] basic safety needs." The mother and father separately appeal.[6]

---

[6] The father's motion to modify disposition asserts the mother "supports this motion." The mother did not contradict the father's assertion but also never filed her own motion or stated on the record she was joining the father's. The mother's attorney was present at the September hearing, which took place online due to COVID-19, but the mother was silent and, it seems, may not have been present or participating. After the father was asked about the police coming to the home due to allegations he hit the mother and a child, the interpreter informed the court the father was "calling in his daughter and wife to testify." The court stopped the father, telling him, "No, we're not doing that. . . . You're under oath. You're being asked questions."

**II. Discussion.**

As the mother and father recognize, our court has questioned what must be shown before a dispositional order may be modified.  In the past, we held "a party seeking modification of the custody provisions of a prior dispositional order must show the circumstances have so materially and substantially changed that the best interest of the child requires such a change in custody."  *In re C.D.*, 509 N.W.2d 509, 511 (Iowa Ct. App. 1993).  Some of our more recent case law has called that standard into question.  *See, e.g.*, *In re A.J.*, No. 16-1954, 2017 WL 1278366, at *3 (Iowa Ct. App. Apr. 5, 2017).  And panels of this court have concluded it is unnecessary to show a material and substantial change in circumstances because section 232.103 does not require it.  *See, e.g.*, *In re C.P.*, No. 16-1459, 2016 WL 6269941, at *3 (Iowa Ct. App. Oct. 26, 2016); *In re K.S.-T.*, No. 14-0979, 2014 WL 5865081, at *4 (Iowa Ct. App. Nov. 13, 2014).  Under section 232.103(4):

> The court may modify a dispositional order, vacate and substitute a dispositional order, or terminate a dispositional order and release the child if the court finds that any of the following circumstances exist:
> a. The purposes of the order have been accomplished and the child is no longer in need of supervision, care, or treatment.
> b. The purposes of the order cannot reasonably be accomplished.
> c. The efforts made to effect the purposes of the order have been unsuccessful and other options to effect the purposes of the order are not available.
> d. The purposes of the order have been sufficiently accomplished and the continuation of supervision, care, or treatment is unjustified or unwarranted.

Under these circumstances, where the parents are living and parenting together and make virtually identical arguments on appeal, we presume the mother did enough to preserve the issues raised in her appeal.

Here, the mother and father attempt to meet both standards. They each argue the father's return to the family home and ability to help care for the children and engage them in services is a material and substantial change in circumstances. They also assert "the purposes of the order have been accomplished and the child is no longer in need of supervision, care, or treatment" and "the continuation of supervision, care, or treatment is unjustified or unwarranted." *See* Iowa Code § 232.103(4)(a), (d). The parents also point to section 232.102(9), which provides that at a dispositional review hearing, "[t]he placement shall be terminated and the child returned to the child's home if the court finds by a preponderance of the evidence that the child will not suffer harm in the manner specified" in the CINA adjudication section.

Here, "[a]s in all juvenile proceedings, our fundamental concern is the best interests of the child." *In re K.N.*, 625 N.W.2d 731, 733 (Iowa 2001). While the father's return to the family home after his multi-year incarceration may be a material and substantial change in circumstances, we cannot say it is in D.A.'s best interests to be returned to the family home. The objective of her out-of-home placement—that she may receive the mental-health treatment she needs in a stable, structured environment—is still an ongoing need for D.A. So we cannot say the purposes of the order have been accomplished under section 232.103(4)(a) or (d). Similarly, D.A. would be subject to further adjudicative harm if returned to her parents care. *See* Iowa Code § 232.2(6)(f). While the mother and father have said they will get D.A. the medical help she needs if she is returned to their care, we do not find these statements credible. The parents agree to services for the sake of going along with what is asked of them, but when pressed,

they deny that D.A. needs therapy or medication. Even at the September 2020 hearing, the father agreed to therapy but for the purpose of proving D.A. is "normal." Service providers have tried to explain to the parents that mental-health therapy is necessary for D.A.'s wellness, but the mother and father seem more focused on stigma they associate with mental-health struggles. Additionally, the father's return to the family home has not helped with issues of stability. Service providers and DHS have been prevented from entering the home, and police have been called to the home upon a report of the father perpetrating violence. In the past when asked about domestic abuse issues, the mother did not deny it was an issue but instead claimed it is "private" and refused to elaborate. And while D.A. loves her family, she recognized it is not in her best interest to return to the family home.

The purpose of the dispositional order has not been accomplished and the family's circumstances have not so materially and substantially changed that the best interests of D.A. require such a change in custody. We also cannot find by a preponderance of the evidence that D.A. will not suffer adjudicatory harm if returned to the parents' care. For these reasons, we agree with the juvenile court's denial of the father's motion to modify the dispositional order and the continued out-of-home placement of D.A. from the parents' care.

**AFFIRMED ON BOTH APPEALS.**